And we'll go to the third case, D. Z. v. Buell. Mr. Cooper. Good morning, Your Honor. I'll make sure my colleagues on the other side are seated. Good morning, Judge Tender, Judge Baum. The plaintiff believes that he's here today for three reasons. And if I may point out, that's the plaintiff. He's wearing glasses. He's turned into a young man, but at the time of the incident, he was a 13-year-old boy, a very small 13-year-old boy, about 5'6", and right around 120 pounds. So the first reason the plaintiff believes that he's here today is the contention that the magistrate's court did not view the facts at summary judgment in the light most favorable to the plaintiff. D. Z. I'm pointing to D. Z. That's issue number one. Issue number two is that of immunity and whether or not Officer Buell is entitled to qualified immunity. Issue number three is whether or not in analyzing a stop or a stop and frisk or a seizure where the lookout is for an African-American or a black person is sufficient when the only information is that you're looking for an African-American or a black person. In 2014, I think everyone in this room knows that black people come in various shades, white, medium, dark, different hair textures. The Ninth Circuit summed it up in Washington v. Lambert and I want to turn the court's attention to the Choi case which I cite over and over and over. In Choi, citing to Lambert, the Ninth Circuit stated, quote, police often lower their standards of investigation when a suspect has been described as a minority, thus intruding upon a greater number of individuals who meet the racial description than if the suspect had been described as white. I want to come back to that and I want to delve into two issues that I think can be addressed at once by virtue of Tolan v. Cotton. And those two issues are, one, did the magistrate's court not view the facts in the light most favorable to DeWane or D.Z.? And two, is Officer Buell entitled to immunity? So in Tolan v. Cotton, you have a young man on the porch of his home and a police officer 15 to 20 feet away takes his weapon and fires, hitting the young man in the throat. And our Supreme Court looked at the district court's granting summary judgment in favor of the police officer. Our Supreme Court looked at the Fifth Circuit affirming the district court decision and criticized the Fifth Circuit because the Fifth Circuit held it's not an issue of whether or not excessive force was used. The Fifth Circuit held that the officer was entitled to qualified immunity because he had not violated a clearly established right. And in vacating the judgment of the Fifth Circuit, the Fifth Circuit wrote, and this is a unanimous decision, a unanimous decision on a court that sometimes just can't seem to get along. The Supreme Court of the United States wrote the Fifth Circuit failed to view the evidence at summary judgment in the light most favorable to the plaintiff with respect to the central facts of the case. By failing to credit evidence that contradicted some of its key factual conclusions, the Fifth Circuit improperly weighed the evidence and resolved disputed issues in favor of the moving party. In the Fifth Circuit case, our Supreme Court said, what about the lighting? There was an issue of lighting. What about whether or not the plaintiff made an overt threat? What about the plaintiff's positioning when he was shot? Well, in this case, here's a central fact, and I hope it's clear in the voluminous material that's been filed in this case. Whether or not it was physically possible for Officer Buell to see Officer Golubsky. The landscape says it's impossible. The geography shows it's physically impossible. He could not have seen Officer Golubsky. There is no way he could have seen Officer Golubsky. In fact, his own partner's statement has the two officers in another area at the time. But yet the district court said, hey, Buell saw Officer Golubsky running. Well, guess what? Officer Golubsky doesn't even say she was running. She says she was stuck in her police car. I'm sorry. Officer DeFranchisi, Justice Bauer, says... Judge Bauer. Officer DeFranchisi says if she was doing anything, referring to Golubsky, she was walking. For what reason would DeFranchisi have to lie? The second issue, again, we're looking at the Fifth Circuit and what the Fifth Circuit didn't look at. There is undisputed evidence, isn't there, that someone on a bicycle, a young male, was moving in a direction away from where Officer Golubsky was, right? No, there is not. That's one of the reasons we're here. There's an issue. One, was Golubsky even outside of her automobile? Two, could Buell have seen Golubsky from his vantage point? He can't. He couldn't. The geography doesn't allow it. The second issue. Did DeWane take his bicycle and throw his bicycle down? DeWane says he did not throw his bicycle down. Buell can't get it right. Buell gave approximately three statements. In one statement, he saw DeWane throw down the bicycle. In another statement, DeWane laid down the bicycle. In another statement, he didn't see DeWane with the bicycle at all. Another crucial fact. Whether or not 13-year-old DeWane placed his hands on top of the fence, whether or not he touched the fence, whether or not he touched the lock. Toland v. Cotton really sets the stage for today. In Toland v. Cotton, it says, hey, the 5th Circuit and the District Court should have asked questions about lighting. Looked at plaintiff's evidence that there was a lighting dispute. In this case, clearly there is a dispute as to whether or not Officer Buell could have observed Officer Golubsky. Two, there's an issue of when Officer Buell shows up in the driveway, what's happening in the driveway? The fourth issue. There's a better lookout. The District Court doesn't agree that there's a better lookout. I did one of the most unusual things in this case. I provided every justice with the CD. Exhibit E, document 76-5. And I turned the court's attention to about 8 minutes in. And there is a better lookout. And when I deposed Officer Buell, I asked him, did you have a radio? Yes, I had a radio. And he went on and on about how he was listening to the radio. He was aware of what's happening. At one point, he even claims that he went on the radio. And we've disputed that. We've disputed that. There are no identifiers. The defendants want the three of you to say, okay, if Buell says that was his voice on the radio, then it was Buell's voice. It shouldn't work like that. There was a better description. It was for a tall person, a lanky person, a skinny person, a person without a hat. And yet DeWane was the person stopped and taken into custody. If we look to Illinois v. Wardlaw and we look at what our Supreme Court said in Illinois v. Wardlaw, when that officer puts cuffs on someone or better yet, the officer should engage in an investigation if it really is a carry stop. There should come a point very quickly when the officer attempts to gather information to determine whether or not he has the right person. There's a better lookout on the radio. And it's our position that when that lookout came or was broadcasted, DeWane had not yet been taken into custody. And what I've said to my opponent is, okay, let's assume DeWane had been taken into custody. Why didn't Officer Buell take the handcuffs off? He was 5'6 at the time, about 120 pounds. It's fair to say that within the black community, probably anywhere in America, anyone probably over the age of 30 remembers the episode, the Good Times episode, where J.J., who I assume everyone knows, is taken into custody. He's held at a district station here in Chicago. And in the end, we find out that the lookout is half his size. And it's sort of a funny scene because when you see the person who actually did the crime, he's very short and he's very pudgy and it's clearly not J.J. The Ninth Circuit seems to have... You're into your rebuttal, but go ahead. The Ninth Circuit seems to have it right. And when it refers to people of color, minorities, quote in Choi of 1016, referring to people... Correction. To treat persons in this grouping as fungible when one of the group is a crime suspect would be to say that the police could arrest at will. Officer Buell is not entitled to qualified immunity. He did not act as a reasonable police officer would have acted. And then there's this other issue. What if the lookout had been for a young white person? This is the middle of the day. This isn't... This isn't Illinois v. Wardlaw. In Wardlaw, you have a high drug traffic area. This is the middle of the day. The kids are out of school. And he's one of many children making his way around his neighborhood. What if the lookout had been for a white male? I want to save and use my rebuttal time. All right. Thank you, Mr. Cooper. Mr. DeBerry. Good morning, Your Honors. My name is Brandon DeBerry, and I represent... And may it please the Court, my name is Brandon DeBerry, and I represent the appellee in this case, Officer Mark Buell. 15 minutes, almost the same amount of time that Appellant's Counsel just had to speak to us today. The incident that took place in this case took less than 15 minutes. In less than 15 minutes, Officer Buell responded to the burglary victim's home. He pursued one suspect who he lost in the process. He perceived what he observed... He perceived to be a foot chase between Officer Golubsky and DZ. He embarked on what he perceived to be his own foot chase of DZ. He stopped DZ, he questioned him, he ordered a show-up, he conducted that show-up successfully, and DZ was released, all in less than 15 minutes. And this is why qualified immunity exists. Police officers put their lives on the line every day for our safety, and because of this, qualified immunity allows for reasonable mistakes to be made and protects all but the plainly incompetent or those who knowingly violate the law because police officers should not always err on the side of caution when making split-second decisions because they fear being sued. There are two points that I want to make here today. Appellant's counsel spends much of his briefing in this case in an argument here today, arguing that there are disputed issues of material fact. However, when you look at his arguments and you compare them to the evidence in the record, you see that there are no disputes, as he would like to argue. Further, even if you put those facts that the appellant argues are in dispute to the side, based on the undisputed facts in this case, Officer Buell is entitled to qualified immunity because he was reasonable under the circumstances that he faced. I just mentioned that I talk about some of those undisputed facts. For example, and I'll just give a few examples, the appellant argues, for example, that he didn't put his hands on the fence that lead to the back of his residence. Putting aside for a moment the fact that he doesn't explain why that's material to Officer Buell's qualified immunity, it's undisputed that DZ stated in his OPS interview that he opened the gate. Another disputed fact is whether or not Officer Buell viewed Officer Golubsky running. Officer Golubsky, despite what Appellant's counsel has represented today, Officer Golubsky stated she ran after DZ. Officer Buell stated he observed her run after BZ. Officer Brown said he observed her run after DZ. There's no evidence in the record that precisely places Officer Buell and Officer Golubsky at any precise particular time relative to each other that would allow the court to draw to the conclusion that Officer Buell did not observe Officer Golubsky running. So the point is that when you look at the record and you compare it to the arguments that the Appellant makes, there are actually no disputed facts. Moving along, the District Court was correct in finding that Officer Buell was entitled to qualified immunity because he had arguable reasonable suspicion to stop and detain DZ and that DZ failed in his burden of proving otherwise. Based on the totality of the circumstances in this case, and I'll list them out, that Officer Buell relied on in making his determination to stop and detain DZ are the fact that there were three descriptions given that contained at least five descriptive elements and that DZ matched all of the descriptive elements. Those elements are race, age, gender, the color of his shirt, the color of his shorts. These are all facts that were available to Officer Buell and facts that he testified he relied on in making his stop of DZ. It's undisputed that this all occurred within two blocks of the burglary victim's home. It's undisputed that this all occurred in a very short amount of period of time where Officer Buell was required to make split-second decisions. It's undisputed that Officer Buell heard Officer Golubsky come on the radio out of breath and identify DZ as a suspect, state that he's cutting through the park at Shute Middle School, state that I can't catch up to him, I have to drive around. Those facts are undisputed. You can listen to the radio broadcast that's been submitted with the briefs in this case. It's undisputed that Officer Buell himself thought that DZ was cutting through the yards. It's undisputed that he stated that in the moment that he believed that DZ was cutting through the yards. Based on all of these facts which were available to Officer Buell in a very short amount of period of time, he thought that reasonable suspicion existed to stop and detain DZ, to question him and conduct a show of to dispel that reasonable suspicion that he had developed up to that point. The district court was correct in finding that Officer Buell's stop of DZ was reasonable, temporary, lasted no longer than necessary and used the least intrusive means. It's undisputed that DZ was stopped and detained for 10 minutes, that he was questioned by Officer Buell and that the show-up was conducted successfully. The burglary victim came to DZ's home and indicated that he wasn't the suspect and DZ was let go immediately. For those reasons, the district court... Mr. DeBerry, if I understand Mr. Cooper's argument, he contends that the third broadcast, the third description eliminated his client from suspicion. I may be misstating this argument, but if that is his argument, what's your position on it? Well, the third description, it's undisputed that the third description was given in this case. The Constitution in no case in the circuit has stated that once the third description is given, that the Constitution requires Officer Buell to disregard all of the other facts that had been given, and it was actually the fourth description, so there were the other three descriptions that were given. All of the descriptive elements, DZ matched all of the descriptive elements of those descriptions. There's no constitutional requirement that he disregard that. The fact that he had just seen a chase between Officer Galupski and DZ, the fact that he had embarked on his own chase, the fact that this was all within two blocks of the burglary victim's home, and because of that, whether or not the third description, whether or not Officer Buell heard the third description is not material to the qualified immunity analysis. Does that third description eliminate DZ as a suspect? No, it doesn't. In fact, even if you look at the third description and you couple it with all of the other descriptions that were given, DZ still matches many of the characteristics or the descriptors or descriptive elements contained in all four of the descriptions that had been given. And also, if I understand Mr. Cooper's argument, he's asserting that the force used in restraining DZ after the stop was excessive. Well, he does for the first time in this appeal when it's not, if you look at the complaint in this case, he does not bring an excessive force claim, but even if he had, Judge, courts in this jurisdiction have found much more intrusive detentions of suspects to be held constitutional. Officer Buell also testified in this case that he thought he had just observed DZ on a foot chase with somebody, with another officer, and that he believed that DZ was trying to invade him. In order to prevent DZ from getting hurt, from Officer Buell getting hurt and the other police officers getting hurt, that he felt it was necessary to keep them in handcuffs until the burglary victim showed up in less than 10 minutes and identified him. And as soon as that was over, the handcuffs were removed. You say identified. She was not him. Correct. I misspoke. She negatively identified him as the burglary suspect. All right. The district court was also correct in finding that there was an arguable probable cause existed for Officer Buell to arrest DZ. The district court correctly determined that DZ failed to establish that a reasonable officer in Officer Buell's position could not have reasonably, although mistakenly, believed that probable cause existed to arrest DZ based on the totality of the circumstances. Did you concede it was an arrest as opposed to a stop, a Terry type stop? No, it's the appellee's position that the detention of DZ never transitioned into an arrest. Indeed, as the district court pointed out numerous times, DZ has never articulated in this case what point the detention or what facts made the detention transition into an arrest. However, even if the court were to find that DZ had been arrested, arguable probable cause existed based on the description, descriptions that were given in this case, based on the time, the proximity, the chase and the flight. Based on all of those factors, a reasonable officer in Officer Buell's position could have reasonably, although mistakenly, believed, which is the standard, that probable cause existed to arrest DZ for the crime. For the court to overturn the district court's decision would mean that on the date of this incident, it was clearly established that Officer Buell's actions were violating DZ's clearly established constitutional rights. It would mean that Officer Buell was required by the Constitution to disregard all of the circumstances and facts that had been available to him, descriptions and the fact that DZ matched all of the descriptors in those descriptions, the chase that he perceived, his own chase of DZ, the timing, the proximity. He was required to disregard all of those, unhandcuff DZ, cancel the show-up and let DZ go. But the law, but that is not what the law was at the time. Qualified immunity allows for reasonable mistakes to be made because officers should not fear or should not err on the side of caution when doing their job for fear of suit. The district court was correct in saying that Officer Buell was entitled to qualified immunity and we ask that this court affirm that decision. Unless the court has any questions. Thank you Mr. DeBerry. Mr. DeBerry uses that was not the law at the time. I'm assuming he's referring to Tolan v. Cotton. Tolan v. Cotton I believe was May of 2013. And you have similar facts in the Fifth Circuit case. A couple of things worth calling attention to. Officer Buell is car 281 and car 281 introduces a bicycle into the equation. The same thing happened in Troy. The same exact thing happened. In Troy the officer introduced a second person. The same distance, one-fifth of a mile away from the crime scene. But this was a horrific crime scene. The bad guy had murdered a policeman. And one-fifth of a mile from where that policeman lay in the street bleeding to death. There was a chase. And the Ninth Circuit felt that except for their rash generalization. I'm quoting the Ninth Circuit at 1015. Except for their rash generalization the officers had no reason to think that Troy was their man save that he was within one-fifth of a mile from the abandoned CHP vehicle. I assume that means California Highway Patrol. They argued that next to him was the man they had seen running. But nothing in the police broadcast had indicated that there were two suspects. Now if you go to Defendant Exhibit E which is the audio and you go to about 227 within that tape. Here's what 281 says. We don't know if it's Buell or Brown. We saw a guy from a distance on a bike. Kind of matched that description. We lost him. I'm like Dewey in Oakton. Dispatcher responds. We will take that matching description of Dewey in Oakton. And then what happened? The Calvary was now in action looking for a black child on a bicycle because Buell went on the radio and Buell said we think we see the guy. He kind of matched the description. But Buell shows up at his deposition. And at his deposition when I asked him what can you tell me about the black kid on the bicycle? He says I don't know what he looked like. Ms. Cooper in that regard at Buell's deposition was he asked if he heard that last description? I don't recall specifically how I, I'd have to look at the deposition. I certainly did everything in my power to find out why he did not act according to that description. That's why I asked him did you have a radio? Were you listening to the radio? Were you on the radio? I don't remember how I asked it. I think at least a preliminary look at the record indicates he wasn't asked that. In other words about that description which clearly added factors that were about the high school and probably six feet. So we don't know whether Buell... Well we do know. And we do know because of his prior testimony. His prior here and in the lower court. As I point out how Buell is on the radio. How he's actively on the radio. How he's listening to the radio. How he is responding to people. And even telling me that gee there were so many people on the radio at one point. What I'm saying is that how is it that he can hear every transmission up to that point? That's peculiar. That's for a jury. Summary judgment motion. Your summary judgment motion. Yeah I filed one. Correct. It didn't mention the third broadcast. I don't recall how I I don't recall my strategy in that motion but we're not appealing that denial. My motion for summary judgment. Troy points out at one point at 10-16 in a 1983 action the factual matters underlying the judgment of reasonableness generally mean that probable cause is a question for the jury. In this case and I'm trying to not run out of time here in this case the facts have to be merged into thinking about immunity. And where at some point I think the defendants want them separated out. The final point is this. Buell. It's not Buell who hears someone say put a stop on him. Buell goes on the radio and he tells Golovsky to put a stop on him. Golovsky is the only officer there who's open minded if you want to call it that and she wants more information. It's not enough. On the edge of Chicago right by the Howard CTA station there are black people everywhere and all that you have is an African American in dark clothing. That's not enough. She asks more information and you know what Buell does? He says put a stop on him. I'm out of time.